UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEIRUT TRADERS COMPANY,

        Plaintiff,

                          Case No. 2:09-CV-11176
                          PAUL D. BORMAN
                          UNITED STATES DISTRICT JUDGE

v.


THE NEIMAN MARCUS GROUP, INC.,
and MAERSK, INC.,

        Defendants.

_____/


OPINION AND ORDER
(1) GRANTING DEFENDANT NEIMAN MARCUS GROUP, INC.'S MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6) and
(2) GRANTING DEFENDANT MAERSK, INC.'S MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56

      Now before the Court are Defendant Neiman Marcus Group Inc.'s ("Neiman") Motion to

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Defendant Maersk, Inc.'s

("Maersk") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  A

hearing was held on Wednesday, October 7, 2009.  For the following reasons, the Court GRANTS

Defendant Neiman's Motion to Dismiss and GRANTS Defendant Maersk's Motion for Summary

Judgment.

I.      **BACKGROUND**

      This case involves four containers of Neiman shopping bags (the "Bags") which were

manufactured in China, by a third party engaged by Ampac Plastics, Inc. ("Ampac"), for Neiman

pursuant to an agreement between Ampac and Neiman.[1]  (Neiman Mot. Ex. 9 at 5, 7, ¶¶ 28-30.)  The Bags, which were shipped from China by Ampac aboard a vessel owned and operated by Maersk, arrived in the United States, Mobile, Alabama, on December 16, 2006 and were consigned to Ampac's agent, Hecny Transportation, Inc. NYC ("Hecny").  (Maersk Mot. 2 Ex. A.)[2]  Neiman refused to accept or pay for the Bags.  (Neiman Mot. Ex. 8 ¶¶ 40-44.)  Neither Ampac nor Hecny ever picked the Bags up from Maersk.  (Maersk Mot. Ex. B, Rembaum Aff. ¶ 5.)

In February, 2007 Maersk informed Hecny that if the Bags were not picked up, Maersk would invoke its rights under the Bill of Lading to consider the Bags "abandoned" and sell them for salvage.  (Maersk Mot. 2-3.)  In April, 2007, Hecny did pay $40,000 on outstanding demurrage charges but failed to make further payments or pick up the goods.  (*Id*. 3; Ex. B Rembaum Aff. ¶ 6.)  "After many months of Hecny's failure to claim the cargo and pay the outstanding demurrage, Maersk requested and received a formal letter of abandonment [from Hecny] of the cargo so Maersk could sell the unclaimed cargo for salvage on July 21, 2007.)  (*Id*. ¶ 7; *Id.* Ex. D.)[3]

---

[1]There was also a Texas lawsuit between Ampac and Neiman, *Ampac Plastics, LLC v. The Neiman Marcus Group, Inc.*, Civil Action No. 07-CV-1278K, United States District Court, Northern District of Texas. The Texas case, which has recently settled, involved Ampac's claims that Neiman refused to accept or pay for the Bags that are at issue in this lawsuit (and other bags not concerned in this lawsuit manufactured by Ampac for Neiman) and Neiman's counterclaims that Ampac failed to produce and deliver bags that conformed to Neiman's quality standards.

[2]Although the relationship between Ampac and Hecny is not clearly spelled out in the parties' papers, there is no dispute that Hecny was the consignee of the goods (Maersk Mot. Ex. A) and that Ampac was the responsible party to take delivery of the goods when they arrived in the States and that Maersk looked to Hecny and /or Ampac for the storage fees that accrued on the unclaimed Bags. (Neiman Mot. Ex. 8, ¶ 43.)

[3]This notice of abandonment from Hecny to Maersk is significant because Beirut claims in its Response to Neiman's motion to dismiss (and throughout its papers) that: "When the [All Occasion Bags] arrived in the United States, Neiman refused to take delivery and refused to pay Maersk for shipment.  Neiman abandoned the Bags that it knew were delivered."  (Pl.'s Resp. to Neiman's Mot. 5.)  Contrary to Beirut's assertion that "Neiman" abandoned the Bags, the record is clear that in fact

On September 22, 2007, apparently concluding that the Bags had been abandoned, Maersk listed the Bags, which bear the classic Neiman Marcus logo, for auction on "Salvagesale.com" as "abandoned cargo" and "department store shopping bags."  (Pl.'s Resp. to Neiman's Mot. 5-6; *Id.* Ex. B; Maersk's Mot. Ex. B ¶ 8.)  Bidding on the Bags concluded on September 27, 2007 and on September 28, 2007, Maersk approved Plaintiff Beirut as the winning bidder at $5,000.  (Maersk's Mot. Ex. B ¶ 8; Pl.'s Resp. to Neiman's Mot. 6.)  On October 3, 2007,  Plaintiff paid the purchase price into an escrow account and was given directions where to pick up the goods on or before October 5, 2007.  (Maersk's Mot. 4 Ex. F.)

On October 1, 2007, Beirut contacted Neiman to inquire whether Neiman wanted to purchase the distressed NeimanBags that Beirut had just purchased on the internet.  (Pl.'s Resp. to Neiman's Mot. 6.)  In its counterclaim filed in the Texas lawsuit, Neiman describes this contact as follows: "On or about October 1, 2007, Neiman Marcus received a communication from a person unknown to it named Mike Hassan Amine ("Amine") from a company called Beirut Traders in Dearborn Heights, Michigan.  Mr. Amine informed Neiman Marcus that he had just purchased approximately 1.4 million All Occasion Bags over the internet and inquired whether Neiman Marcus would be interested in buying the Bags from him. Mr. Amine further informed Neiman Marcus that it was or

---

Hecny, Ampac's agent, sent Maersk the notice of abandonment.  There is absolutely no evidence in the record, and Beirut offers none, that Neiman had any knowledge of Hecny's notice of abandonment. Indeed, Neiman's intense efforts to have these Bags destroyed beyond recognition to protect their mark after settlement of the lawsuit with Ampac belies any suggestion that they would have so casually "abandoned" the Bags.  It is also clear that Maersk looked only to Ampac and/or Hecny for payment of the storage fees.  There is no evidence that Maersk ever attempted to hold Neiman responsible for shipping charges, or to collect payment from Neiman for the unpaid storage fees.   While it is true that Neiman ultimately rejected the Bags from Ampac as nonconforming, no one (aside from Beirut) has suggested that Neiman had any relationship with Maersk that obligated Neiman to pay for shipping or storage or to pick up the Bags from Maersk. It was Ampac, not Neiman, who engaged Maersk to ship the goods for pick up by Hecny.

is his intent to resell the 1.4 million All Occasion Bags to discount "dollar stores" nationwide if Neiman Marcus did not wish to purchase the bags." (Neiman Mot. Ex. 9 ¶ 47.) On October 2, 2007, Neiman purchasing supervisor Bob Houston responded to Mr. Amine, stating that in order to consider purchasing the Bags, he would need Mr. Amine to overnight a sample of the Bags along with a confirmation of quantity, a bill of lading, a receipt showing ownership and the location where the Bags were stored. (Pl.'s Resp. to Neiman's Mot. Ex. E.) Beirut claims that "subsequent to Neiman's rejection, Beirut obtained an agreement to sell approximately 1.4 million bags at .45¢ per bag ($630,000) to another entity." (Pl.'s Resp. to Neiman's Mot. 6.) Beirut does not identify the other "entity" and does not provide a copy of any agreements.

At this point, Neiman's attorneys became involved and began to notify all parties involved that the Bags in question may bear Neiman's trademark and that their sale or transfer could violate Neiman's intellectual property rights. On October 10, 2007 Neiman's attorneys sent a letter to Ampac's counsel requesting a Rule 26(f) conference in the Texas lawsuit:

> We need to have an immediate Rule 26(f) conference for the purpose of conducting limited discovery, and discussing you client's apparent transfer and/or abandonment of the subject Neiman Marcus bags. Some bags appear to have been auctioned on an internet site called "Salvagesale.com."
>
> We view such transfer and/or abandonment of the subject Neiman Marcus bags as a violation of my client's intellectual property rights and other Federal Law, which has resulted in harm to my client.
>
> I also respectfully request that you immediately provide me with information regarding the location and status of any of the remaining bags. Do not further transfer and/or abandon any of the remaining bags without first obtaining written authorization from me or my client.

(Neiman Mot. Ex. 3.) On the same day, Neiman's counsel sent a letter to Mr. Amine (Beirut) advising him that the Bags that he purchased on Salvagesale.com may bear the intellectual property

4

of Neiman and advising Mr. Amine to refrain from obtaining the Bags and contact him to discuss the location and status of the Bags. (Pl.'s Resp. to Neiman's Mot. Ex. F.) On October 12, 2007, Neiman's counsel sent another letter to both Beirut and Maersk, copying counsel for Ampac and referring to the Texas lawsuit regarding the Bags between Ampac and Neiman, and reiterating to both Beirut and Maersk the importance that the Bags not be transferred, sold or disposed of until further notice from Neiman. (Pl.'s Resp. to Neiman's Mot. Ex. G.) On October 18, 2007, counsel for Ampac sent an email to counsel for Neiman, on which Beirut relies heavily in making its claims against Maersk and Neiman in this case. The email indicates that Ampac's counsel had done some investigation to try to ascertain for Neiman what was going on with the Bags that Beirut tried to sell to Neiman, which it claimed to have purchased on "Salvagesale.com." In its entirety, the email states:

> Here is what we have so far.
>
> Our clients [Ampac] have in their possession one container of Neiman Marcus bags. These bags sit in a warehouse in Alabama.
>
> There are four additional containers in Alabama. These containers are currently in the possession of Maersk. According to Ron Rimbaugh [sic][Maersk], the contents of those four containers are the goods sold on Salvagesale.com to Beirut Traders.
>
> Our client [Ampac] did not take delivery of the goods in the four Maersk containers. Mr. Rimbaugh [sic] informed me that certain storage charges are owed on those four containers dating back to mid-April (Hecny Transportation had paid the storage fees until then). The goods were put on Salvagesale.com because, according to Mr.Rimbaugh [sic], storage fees are owed.
>
> Mr. Rimbaugh [sic] is willing to negotiate the amount of storage fees, and we are looking into that on our end. Furthermore, as I noted earlier, Mr. Rimbaugh assured me that Maersk will accept no payment from Salvagesale.com until we have worked something out. I expect that Mike Amin with Beirut Traders will have something to say about that.
>
> As far as we know, there may be an additional eight containers of bags that reside in

5

China.  We are looking into that on our end as well.

Finally, I am still waiting for a breakdown of numbers from our client and the vendor in China.

Jerome

(Pl.'s Resp. to Neiman's Mot. Ex. H.)

On October 19, 2007, the day after receiving this confirming information from Ampac, Neiman's counsel sent a letter to Beirut and Maersk, with a copy to Ampac, formally advising them that the Bags which Beirut purchased from Maersk bore Neiman's copyright protected tradename, as well as copyrighted and proprietary art works belonging to Neiman, and that any sale, transfer, or distribution of the Bags would be a violation of federal and state law, entitling Neiman to damages and injunctive relief from any person infringing on their rights.  Specifically, the letter states: "It is our understanding that Maersk, Inc. and Beirut Traders have entered into a putative agreement for the sale of approximately 1.4 million of the above-referenced bags.  As explained above, these bags cannot be sold, as any such agreement for their sale would be illegal.  Neiman Marcus requests that you rescind the agreement immediately and send our office a copy of the rescission." (Pl.'s Resp. to Neiman's Mot. Ex. I.)  Maersk notified Salvagesale.com on October 18, 2007 that it was highly unlikely that Neiman was going to allow the Bags to be sold to a third party and instructed them to cancel the sale [to Beirut] and refund the purchase price. (Pl.'s Resp. to Maersk's Mot. Ex. K.)  On October 23, 2007, Salvagesale.com sent Beirut a refund for the Bags, stating: "Per our conversation, we are sending you a refund check for $5,190, which was the full amount you paid for this Auction.  Unfortunately, there was a problem with the Brand Protection Agreement between Neiman Marcus and Maersk and we were not supposed to sell these bags on behalf of Maersk.  I apologize for the inconvenience."  (Pl.'s Resp. to Neiman's Mot. Ex. J.)

6

On June 12, 2008, Ampac and Neiman reached a settlement agreement in the Texas lawsuit which specifies that, as a condition to finalizing the agreement, Ampac agree to completely destroy and/or recycle all of the containers of Neiman's bags held in the possession or control of Maersk, Hecny, or Ampac and to provide Neiman with third-party documentation certifying the destruction or recycling.  (Status Report, Attachment A ¶ 3.)  The Report states that, upon information and belief, M.A. Norden Paper Company had shredded the Bags and compressed them into bales for export.  Neiman was still in the process of securing the follow up confirmation from Ampac that the bags shredded and baled by Norden were in fact the Neiman bags.  Upon verification from Norden, the settlement was expected to become final. (*Id*. ¶¶ 4-7.)

## II.  STANDARDS OF REVIEW

### A.  Motion to Dismiss – Neiman

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be

enough to raise a right to relief above the speculative level...." *Id.* at 555 (internal citations omitted).

The Supreme Court recently clarified, in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), that:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969). In addition to the allegations and exhibits of the complaint, a court may consider "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citations omitted). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997).

8

**B.  Motion for Summary Judgment – Maersk**

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

9

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III.   ANALYSIS

### A.  Neiman's Motion to Dismiss

The core issue involved in Plaintiff's claims against Neiman is whether Neiman, in attempting to forestall the sale of the Bags from Maersk to Beirut, was acting to protect its trademark or was conspiring with Maersk, for some other reason, to defeat the contract for sale between Maersk and Beirut. Beirut's claim that Neiman had some ulterior motive (which Beirut never does articulate) in attempting to stop the sale of the Bags, and "conspired" with Maersk to do so, is simply not plausible under the facts as alleged.

### 1.  Tortious Interference with Business Relationships and/or Expectancies Against Neiman (Count I)

Beirut claims in Count I against Neiman that: "Neiman made false statements, knowing said to be false, with regard to its ownership interest in the abandoned bags and/or its proprietary interest in the bags given the fact that Neiman had knowingly abandoned said bags, for the purpose of

10

wrongfully intimidating Maersk into breaching its agreement with Beirut Traders and/or for the purpose of avoiding its contractual obligation to pay Ampac for the manufacture of the subject bags." (Compl. ¶ 31.) Neiman responds that Beirut has not pled facts that make its claim, that Neiman acted unlawfully or with malice for the purpose of interfering with Maersk's contract of sale with Beirut, plausible.

This Court identified the elements of a claim for tortious interference in *Lorillard Tobacco Co. V. Yazan's Service Plaza, Inc.*, 2006 WL 2594937, No. 05-70804 (E.D. Mich. Sept. 11, 2006).[4] "The elements of tortious interference with a business relationship are the: (1) existence of a valid business relationship or expectancy; (2) the knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) the resultant damage to the plaintiff." *Raymond James & Assocs. v. Leonard & Co.*, 411 F.Supp.2d 689, 698 (E.D.Mich.2006) (citing *BPS Clinical Lab. v. Blue Cross & Blue Shield*, 217 Mich. App. 687, 698-99 (1996)). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act, or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship of another." *Feldman v. Green*, 138 Mich. App. 360, 378 (1984). "To establish that a lawful act was done with malice and

---

[4] As a preliminary matter, there is a dispute as to which state's law governs this contract. Maersk argues that the Court should enforce the contractual choice of law clause in the agreement, which provides that law of the State of Texas shall govern the contract. (Maersk Mot. 6-7.) Beirut contends that public policy considerations favor applying Michigan law. (Pl.'s Resp. to Maersk's Mot. 9-11.) In spite of its contention that Texas law should apply, Maersk addresses both Michigan and Texas law, with substantially similar results. Because the same result would inhere regardless of whether the Court applied the law of Michigan or Texas, this Court will accept Beirut's choice and analyze the state law claims under Michigan law.

11

without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Lab.*, 217 Mich. App. at 699.  It is important to bear in mind that "where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id*. Neiman invites this Court to assume, for purposes of this motion, "that Beirut Traders had a business expectancy, Neiman had knowledge of the expectancy, Neiman in fact intentionally interfered, and Beirut Trader's was damaged as a result."  (Neiman's Reply to Pl.'s Resp. to Mot. to Dismiss 2.) Neiman's defense to Beirut's claim of intentional interference rests upon its contention that (1) Beirut's claim that Neiman committed an unlawful act or acted with malice unjustified in the law is not plausible and (2) that the actions taken to forestall the sale from Maersk to Beirut in an effort to protect its trademark were protected by the federal *Noerr-Pennington* doctrine.

### a.        Beirut's Tortious Interference Claim

Neiman denies that Beirut's allegations of tortious interference survive the *Twombly/Iqbal* plausibility test. Neiman argues that Beirut's allegations fail to allege "affirmative acts by the defendant that corroborate the improper motive of interference."  *BPS Clinical Lab, supra* at 699. A parsing of paragraph 31 of Beirut's Complaint as to this allegation, quoted in full above, reveals that Beirut claims that Neiman (1) knowingly made false statements (2) with regard to its ownership or proprietary interest in the Bags (3) which Bags Neiman had knowingly abandoned (4) for the purpose of wrongfully intimidating Maersk into breaching its agreement with Beirut.  While these claims, if true, may satisfy the intentional interference test, under *Twombly* and *Iqbal*, this Court is required to determine whether such allegations are plausible and not speculative or whether, "given more likely explanations, they do not plausibly establish this purpose."  *Iqbal, supra* at 1951.

12

Beirut does not suggest that Neiman's claim to a trademark protected interest in the Bags is false or that the Bags do not in fact bear the Neiman trademark logo.  In fact, Beirut apparently recognized the value of the Bags to Neiman as evidenced by its attempt to sell the Bags back to Neiman before attempting to sell them to anyone else.  Beirut's claim in this regard hinges on its allegation that Neiman "knowingly abandoned" the Bags.  Beirut states that the specific interference about which it complains included 'false statements, knowing said statements to be false, with regard to its ownership interest in the abandoned bags and/or its proprietary interest in the bags *given the fact that Neiman had knowingly abandoned said bags*, for the purpose of wrongfully intimidating Maersk into breaching the agreement with Beirut.'" (Pl.'s Resp. to Neiman's Mot. 12-13) (emphasis added.)  This allegation finds no support in the record and is not plausible; Neiman was acting to protect its name and reputation by preventing Maersk from selling the Bags, which it considered to have been poorly manufactured, from entering the stream of commerce.

Beirut alleges throughout its brief that "Neiman abandoned the bags."  However, it is clear from the documentary evidence relied on by Beirut, as well as Neiman and Maersk, that Hecny (an agent of Ampac), not Neiman, abandoned the Bags.  Hecny was the consignee of the Bags that arrived in the States, and Hecny (or Ampac), not Neiman, had a contractual obligation to Maersk for shipping and storage charges and Hecny (or Ampac) abandoned the Bags, not Neiman.  (Pl.'s Resp. to Maersk's Mot. Ex. I; Maersk's Mot. Ex. D.)  Indeed, Maersk never looked to Neiman to recover storage fees, but only looked to the consignee, Hecny.  (Maersk's Mot. 2-3.)  And it was Hecny's letter of abandonment on which Maersk relied in listing the Bags with Salvagesale.com. (Maersk's Mot. 3.)

Further supporting the implausibility of Beirut's contention that Neiman "abandoned" the

13

Bags, are Neiman's actions taken immediately upon learning of the potential sale of its Bags to Beirut (Pl.'s Resp. to Neiman's Mot. Exs. F, G and I) and Neiman's extensive efforts to ensure that the Bags were ultimately destroyed beyond recognition as a condition of settlement in the Texas lawsuit with Ampac.  (*See* Status Order attached hereto as Ex. A.)  It is simply not plausible that Neiman would have so cavalierly "abandoned" the Bags bearing its trademark, which it considered (rightly or wrongly) to be substandard and poor quality, allowing them to be injected into the stream of commerce, particularly the "gray" market for salvaged goods.[5]

There is no evidence, and Beirut cites none, that Neiman had any knowledge of the provisions of the shipping contract between Maersk and Ampac (or Hecny) that would have allowed a sale of it Bags for the failure of Ampac to pay storage fees.  Neiman was not a party to that contract.  As Neiman admits for purposes of this motion, there is no question that Neiman quite intentionally interfered with the agreement between Beirut and Maersk.  This is documented by the numerous letters threatening litigation against both Beirut and Maersk if they consummated the sale. The only issue is whether these actions by Neiman were illegal or a malicious and unjustified attempt to defeat the agreement between Beirut and Maersk, or whether Neiman acted quickly and appropriately to prevent what it perceived as a potential infringement of its valuable trademark.

---

[5] Neiman also makes the point that it "rejected" the Bags pursuant to the Ampac contract, which is a much different concept than "abandoning" the Bags. In support, Neiman relies on *Furminator, Inc. v. Kirk Weaver Enters.*, 545 F. Supp. 2d 685 (N.D. Ohio 2008) where a trademark owner rejected tools made in China and ordered them destroyed.  In fact the goods were sold to a surplus company and the trademark owner sought to enjoin the sale.  *Id.* 690.  Recognizing a trademark owner's right to control the quality of the goods which bear its mark, the court held that trademark goods as to which the trademark owner has quality objections are not genuine and cannot be sold by a third party.  "Goods are not genuine until their sale is authorized by the trademark holder."  *Id.* at 690. Here, although Neiman rejected the Bags for quality reasons, it did not thereby relinquish its right to protect its trademark.  Any suggestion by Beirut that this "rejection" was tantamount to "abandonment" lacks merit.

Beirut has not pled sufficient facts to make its version of the facts plausible.

      **b.**    **The Applicability of the *Noerr-Pennington* Doctrine**

In addition to its argument that the facts as alleged by Beirut fail to state a claim of tortious interference, Neiman also argues (in its Supplemental Brief) that its conduct in this case is protected by the *Noerr-Pennington* doctrine.  This was discussed by both parties at oral argument.  "The *Noerr-Pennington* doctrine, based on the right to seek redress in the courts, provides that a party 'may not be subjected to liability for its attempt to have its rights protected by the courts unless that attempt is shown to have been a mere 'sham.'" *Melea Ltd. v. Quality Models, Ltd.*, 345 F. Supp. 2d 743, 758 (E.D. Mich. 2004) (citing *Pennwalt Corp. v. Zenith Lab., Inc.,* 472 F. Supp. 413, 424 (E.D. Mich. 1979).  Relying on *Pennwalt*, and a case from the Michigan Court of Appeals, *Melea* found that plaintiff's letters to defendant's potential customers, which threatened to file lawsuits against them, were protected communications – "plaintiffs are immune from liability" – under the *Noerr-Pennington* doctrine, concluding: "Therefore, the *Noerr-Pennington* doctrine bars Defendant's counterclaim for tortious interference with a business relationship arising from Plaintiffs' letters to Defendant's customers."  345 F. Supp. 2d at 758.  In *Audi AG and Volkswagon of America v. D'Amato*, 341 F. Supp. 2d 734, 758-759 (E.D. Mich. 2004) this Court, citing *Pennwalt, supra,* although basing its decision on the alternative ground of the litigation privilege, recognized that the plaintiff's pre-lawsuit correspondence, asserting its rights as a trademark holder, could be protected activity under the *Noerr-Pennington* doctrine.[6]

---

[6] Beirut urges this Court to reject application of the *Noerr-Pennington* doctrine in the instant case based upon its interpretation of the district court opinion in *In Re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618 (E.D. Mich. 2000).  However, Beirut misreads in *In Re Cardizem*, which in fact recognizes that the type of activity involved in this case, i.e. Neiman's threats of litigation against Maersk and Beirut, are precisely what the *Noerr-Pennington* doctrine seeks to protect. "While it is

Similarly, here, this Court need not necessarily decide the applicability of *Noerr-Pennington* because Beirut fails to plead sufficient facts to sustain its tortious interference claim. However, were this Court to apply the doctrine, Beirut's assertions regarding the "sham exception" are without merit. As this Court noted in *Audi*, *supra*, the sham exception applies to "illegal, reprehensible practices such as perjury, fraud . . . or [conduct that] is so clearly baseless as to amount to abuse of process." 341 F. Supp. at 759. Neiman's efforts to protect its trademark here, which it tried to enforce by its motion for a preliminary injunction in the Texas litigation and by requiring destruction of the Bags in the settlement of that case, clearly does not amount to a "sham."[7] Beirut points to Neiman's "abandonment" of the Bags as evidence of the sham nature of its threats to file a lawsuit but, as discussed above, the facts do not support the contention that Neiman ever abandoned the Bags. Beirut's claims in this regard are without merit. Beirut's claim that Neiman "abandoned" the Bags and then maliciously interfered with Bierut's agreement with Maersk for some ulterior motive beyond protecting its trademark lacks sufficient plausibility to survive Neiman's motion to dismiss.

### 2. Statutory Conversion and Civil Conspiracy - Neiman and Maersk (Count III)

---

true that the courts have extended Noerr-Pennington immunity to non-sham, pre-litigation threats of suit, demand letters, and communications about pending suits, the HMRI/Andrx Agreement does not fall within this category of immunized pre-litigation conduct." *Id*. at 637. At issue in *In Re Cardizem* was a purely private market allocation agreement between horizontal competitors who claimed that their agreement was protected under *Noerr-Pennington* because it was entered into during the course of pending litigation. *Id*. at 635. This is a very different matter involving Neiman's correspondence, directed simultaneously to both Maersk and Beirut, threatening to institute litigation against one or both parties if the sale were to proceed.

[7]Although Beirut argues that Neiman's threats of litigation against Maersk and Beirut were attempts to avoid having to file a motion for a preliminary injunction in the Texas case, in fact the letters in this case were virtually contemporaneous with that filing, which occurred October 31, 2007 and at that time, Maersk had already rescinded the agreement to sell the Bags to Beirut (Maersk's Mot. Ex. I.) Accordingly, this argument lacks merit.

Beirut claims that Neiman is guilty of statutory conversion, actionable under MCL § 600.2919a.[8]  This statute provides a remedy against one who is alleged to have facilitated a conversion, not one who actually accomplishes a conversion:

> Statutory conversion ... consists of knowingly 'buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property.' MCL 600.2919a." *Head v. Phillips Camper Sales Rental, Inc.*, 234 Mich. App. 94, 111, 593 N.W.2d 595 (1999). The clear language of the statute indicates that the "statute is not designed to provide a remedy against the individual who has actually stolen, embezzled, or converted the property." *Marshall Lasser, PC v. George*, 252 Mich. App. 104, 112, 651 N.W.2d 158 (2002). Rather, "[t]he actions proscribed-buying, receiving, or aiding in the concealment-all occur after the property has been stolen, embezzled, or converted by the principal." *Id.* "If the Legislature had meant for the statute to also apply to the thief as well as someone who aids him, it could have written the statute to include the thief's action in possessing or concealing the property." *Id.*

*Campbell v. Sullins*, 257 Mich. App. 179, 191-92 (2003) (holding that where defendant, as the principal, actually converted the property, his conduct was not actionable under MCL § 600.2919a). *See also Ticor Title Ins. Co. v. Nat'l Abstract Agency, Inc.*, 2007 WL 2710113, No. 05-CV-73709 at * 10 (E.D. Mich. Sept. 13, 2007) (holding that "statutory conversion is not designed to provide a remedy against the individual who had actually stolen, embezzled, or converted the property."); *Stewart Title Guar. Co. v. Lockman*, 2008 WL 820359, No. 05-CV-92; 05-CV-736 at * 5 (W.D. Mich. March 25, 2008) (recognizing that the Michigan conversion statute, MCL § 600.2919a, "provides a remedy against the accomplice only and not against the person who actually stole,

---

[8] Specifically, M.C.L. § 600.2919a provides:

A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

embezzled or converted the property.").[9]

Beirut can not claim that Neiman bought, received, or aided in the concealment of stolen or embezzled property as Beirut does not allege that Neiman ever physically attempted to possess the Bags. Nor can Neiman be accused of aiding in the concealment of such property. The most it can be accused of is sending letters which caused Maersk unilaterally to decide to rescind the agreement with Maersk. Beirut offers no evidence that Maersk and Neiman worked together to conceal the Bags from Beirut. Nothing that Beirut has alleged, or provided by way of documentary evidence, supports the theory that Maersk and Neiman were working together to conceal the Bags from Beirut. As discussed above, the October 18, 2007 memo on which Beirut relies to support its claim that Maersk and Neiman were working together was actually a communication between Ampac and Neiman, not between Neiman and Maersk.

Similarly, Beirut's "conspiracy" claim fails. The elements of civil conspiracy are: "(1) a concerted action; (2) by a combination of two or more persons; (3) to accomplish an unlawful purpose; (4) or a lawful purpose by unlawful means." *See United Rentals, Inc. v. Keizer*, 202 F. Supp. 2d 727, 743 (W.D. Mich. 2002) (granting summary judgment where no evidence was presented that defendants acted collectively) (citations omitted). While *United Rentals* was decided on summary judgment, this same conspiracy claim is lodged against Maersk who moves for summary judgment. Thus, any evidence that would support the claim of conspiracy between Neiman and Maersk has been elicited from Beirut by Maersk. The document on which Beirut relies to create this "conspiracy" theory, the October 18, 2007 letter from Ampac's counsel to Neiman's

---

[9] Beirut specifically pleads statutory conversion under the Michigan statute and does not plead common law conversion.

counsel, simply does not support the allegation.  (Pl.'s Resp. to Neiman's Mot. Ex. H.)  First, Beirut disingenuously implies repeatedly in its papers that this document was correspondence between "representatives of Neiman and Maersk."  (Pl.'s Resp. to Neiman's Mot. 16.)  In fact, this document is from Jerome Bishop, counsel for *Ampac* and is sent to Michael Hurst, counsel for Neiman. Maersk is not even a party to the communication and Ampac, not Neiman, is the author.  This hardly supports a theory of conspiracy between Neiman and Maersk.

A more logical interpretation of this communication, quoted above in full and which begins "[h]ere is what we have learned so far,"  is that Neiman had absolutely no idea what was going on with the purported sale of its Bags from Maersk to Beirut and instructed Ampac to investigate the matter and report back to Neiman.  In the email, Ampac's counsel indicates that its client (Ampac) never took delivery of the goods and that Maersk informed him (Ampac's counsel) that the Bags were put on Salvagesale.com because storage fees were owed.  Ampac's counsel states that Maersk was willing to negotiate the amount of storage fees owing (from Ampac, not Neiman) and that Ampac was considering that on their end.  Mr. Bishop goes on to state that Maersk assured him (Ampac counsel) that it would not consummate the deal with Beirut without further instruction from Ampac.  Mr. Bishop then opines that:  "I expect Mike Amin with Beirut Traders will have something to say about that."  This is the language on which Beirut hangs its "conspiracy" theory. But of course Beirut was not going to be happy about Neiman asserting its intellectual property rights and potentially disrupting the deal between Maersk and Beirut.  But this was not a Neiman representative speaking, this was Ampac's counsel informing Neiman of the underlying facts. Beirut's attempt to twist this email into a conspiracy claim against Maersk and Neiman defies logic. Beirut's claim of conversion and conspiracy against Neiman fails to state a claim.  Additionally,

19

without proof of an underlying contractual violation or tortious conduct, a conspiracy claim can not stand. *United Rentals, supra* at 743 (holding that where defendant was entitled to summary judgment on the underlying individual causes of action, there can be no genuine issue of fact on this critical element of the conspiracy claim).   The failure to state a claim of statutory conversion forecloses the claim of civil conspiracy as a matter of law.

### 3.  Fraud - Neiman (Count IV)

The elements of fraud are:  (1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered reliance. *Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 253 n.8 (2005).  Beirut alleges in its fraud Count against Neiman that Neiman: "made material misrepresentations, knowing same to be false, to Beirut Traders Company and/or Maersk and/or Maersk's agent "Salvagesale.com", which included, but were not limited to, threats of litigation relating to an alleged trademark and/or patent infringement, despite the fact that Neiman knew and/or should have known that abandoned goods are not subject to claims of trademark and/or patent infringements and/or violations." (Compl. ¶ 48.)  First of all, as discussed above, it is not plausible to assert that Neiman ever "abandoned" its trademark or its right to protect that mark.  Second, any of the letters that threaten litigation are representations of law and are not actionable. *See Cummins v. Robinson Twp.*, 283 Mich. App. 677, 697 (2009) (holding that alleged false statements were actually legal opinions and statements regarding actions necessary in the future to comply with legal requirements, not false representations concerning an existing or past

fact and could not constitute fraud).

More importantly, however, as to the critical element of reliance, Beirut never relied on these representations in agreeing to purchase the Bags or in any other respect, nor does it claim that it did. As pointed out by Neiman in its reply to Beirut's response to its motion, the documents on which Beirut relies to support its fraud claim (all of which are exhibits to Beirut's response to Neiman's motion) fail to do so: Exhibits H and J are not documents from Neiman. Exhibits K and N relate to Neiman's motion for a TRO in the Texas lawsuit which was filed after the sale to Beirut was rescinded. Exhibits F and I assert Neiman's legal rights. Exhibit G merely states Nieman's opinion that the Bags may be nonconforming to Neiman's standards and asks the parties to hold off until Neiman had a chance to confer with Ampac, and there is no assertion that Beirut in any way relied on this document. Exhibit E is an email from a purchasing agent at Neiman who first responded to Beirut's inquiry regarding Neiman's purchase of the Bags from Beirut. This email, dated October 2, 2007, the day after anyone at Neiman first became aware of Beirut's attempted purchase of the Bags, merely seeks information about the Bags and there is no evidence offered that its author in fact knew exactly which bags Beirut was referencing and was only trying to cover up the "conspiracy" between Neiman and Maersk. In any event, Beirut never relied on this document to its detriment, nor does it claim that it did. Given the events, which are well documented, that follow this discovery by Neiman, i.e. the involvement of Neiman's counsel, the letters threatening litigation, the October 18, 2007 email from Ampac's counsel to Neiman trying to sort out the background facts of Beirut's call to Neiman offering the Bags for sale, it is implausible at best to believe that this purchasing agent, on October 2, 2007 was part of a larger conspiracy already underway to interfere with the Maersk-Beirut agreement. Moreover, Beirut does indicate how it relied on this document to its

21

detriment.  Beirut's allegations of fraud against Neiman fail to plausibly suggest an actionable claim of fraud.

### B.    Maersk's Motion for Summary Judgment

Maersk argues in its motion for summary judgment (1) that Beirut is not entitled to damages because the Salvagesale contract limits damages to the purchase price, which Maersk has fully refunded to Beirut; (2) that even if Beirut can prove that Maersk breached the contract in such a way that it cannot rely on the limitations of damages provision, Maersk is protected by the doctrine of impossibility/frustration of purpose as a defense to Beirut's breach of contract claim; (3) that it did not commit statutory conversion or conspiracy; and (4) that it lacked the requisite knowledge necessary to establish a fraud claim.

### 1.  Breach of Contract - Maersk (Count II)

#### a.  The Limitations of Damages Provision

The sale of the Bags was subject to the terms and conditions provided by Salvagesale.com as identified at the bottom of the listing for the Bags. Specifically, Section 3 provides as follows in bold letters:

> DISPUTES BETWEEN USERS; LIMITATION OF  LIABILITY BETWEEN BUYER AND SELLER.
>                         ***
> FOR ANY TRANSACTIONS BETWEEN BUYER AND SELLER ON THE SITE, BUYER AND SELLER AGREE AS FOLLOWS:
>
> > (a) ALL ITEMS LISTED ON THE SITE ARE SOLD "AS IS, WHERE IS" WITH NO WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, UNLESS OTHERWISE EXPRESSLY SET FORTH IN THE TERMS OF SALE  FOR SUCH ITEM AND LABELED AS A "WARRANTY".
>
> > (b) *IN NO EVENT SHALL BUYER OR SELLER BE LIABLE TO EACH*

22

*OTHER FOR* SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND, OR *ANY LOST REVENUE OR ANTICIPATED PROFITS, ARISING OUT OF OR IN CONNECTION WITH SUCH TRANSACTION.*

(c) *IN NO EVENT SHALL THE LIABILITY OF SELLER TO BUYER, OR BUYER TO SELLER, FOR ANY SUCH TRANSACTION EXCEED THE PURCHASE PRICE OF THE PURCHASED ITEMS* AND, IF THE PURCHASED ITEMS HAVE ALREADY BEEN RELEASED TO BUYER, THE REASONABLE LOGISTICS COSTS INCURRED BY BUYER FOR THE TRANSPORTATION AND STORAGE OF THE PURCHASED ITEMS.

(Pl.'s Resp. to Maersk's Mot. Ex. A, ¶3) (emphasis added).

Maersk argues, relying on this provision, that the very terms of the contract expressly provide that any alleged damages arising out of the sale of the subject Bags is limited to the purchase price ($5,000 + $200 commission). Because Beirut has been refunded this full amount, which Beirut does not dispute, Maersk claims that Beirut has no damages. "Under Michigan law a contractual agreement to limit damages will be upheld unless it is deemed 'unconscionable.'" *Jacada (Europe), Ltd. v. Int'l Mktg. Strategies*, 2003 WL 24267645, No. 02-CV-479; 02-CV-78 at * 5 (W.D. Mich. Oct. 22, 2003) (citing *WXON-TV, Inc. v. A.C. Nielsen Co.*, 740 F. Supp. 1261, 1264 (E.D. Mich. 1990) and *St. Luke's Hosp. V. SMS Computer Sys., Inc.*, Nos. 92-1205, 92-1206, 1993 WL 188457 (6th Cir. June 1, 1993) (unpublished)). "Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power." *Id.* at * 6. *See also U.S. Fibres, Inc. v. Proctor & Schwartz*, 509 F.2d 1043, 1048 (6th Cir. 1975) (upholding limitation of damages provision in contract between purchaser of machinery and manufacturer). The question of the reasonableness of an agreed upon damages provision is a question of law for the court to determine in light of all the circumstances. *Skyline Steel Corp. v. A.J. Dupuis Co.*, 648 F. Supp. 2d 360 (E.D. Mich. 1986).

Beirut argues that this limitation of damages provision is unconscionable under MCL §

440.2302.   Perhaps even more illuminating, for purposes of this analysis, than the general unconscionability provision cited by Beirut, are the more specific limitation of damages provisions contained in MCL § 440.2718 and MCL § 440.2719, both of which make clear that contractual provisions which limit or define damages are enforceable if they are "reasonable under the circumstances" and provide "at least minimum adequate remedies."   "When two sections deal with the same conduct, and one deals particularistically with reasonably clear standards, and the other deals with the problem only in terms of emotional coloration, the latter provision is unlikely to be of any help in solving a problem of specific application. . . . As benchmarks for determining the permissibility of a remedy limitation, 2-302's "oppression and unfair surprise" can't hold a candle to 2-719's 'fail of its essential purpose . . . .' "  Arthur Allen Leff, *Unconscionability and The Code - The Emperor's New Clause*, 115 U. Pa. L. Rev. 485, 519 (1967) (citations omitted).  Both damage limitation provision sections presume that clauses which specify damage amounts will be upheld where reasonable in the circumstances of the case.  *See* MCL § 440.2718, Comment 1 ("Under subsection (1) liquidated damage clauses are allowed where the amount involved is reasonable in light of the circumstances of the case."); MCL § 440.2719, Comment 1 ("Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.").

Beirut concedes that the Salvagesale contract contains a limitation of damages provision, but claims that its application in this case would lead to an unconscionable result here because Beirut had already negotiated with a third party to resell the Bags at a significant profit.  (Pl.'s Resp. to Maersk's Mot. 13.)  While Beirut does not provide any evidence of this alleged third-party contract, assuming it did exist, these are the very type of damages sought to be avoided by the parties'

24

bargained-for limitation clause.  The case on which Beirut relies to support its unconscionability argument, *Latimer v. William Mueller & Son, Inc.*, 149 Mich. App. 620 (1986), involved a contract with a general warranty of merchantability.  Here, as Maersk points out in its Reply, the deal was struck on a salvage website and was expressly an "As Is, Where Is" contract with "No Warranties of Any Kind." (Pl.'s Resp. to Neiman's Mot. Ex. D, ¶3).   This is not a situation that calls for rejection of the well accepted principle that parties are free to shape their remedies and that limitations of damages provisions that provide some remedy are generally enforceable.  Clearly the full refund plus commission returned to Maersk is reasonable in light of the circumstances.

Beirut also appears to argue that Maersk should be precluded from relying on this provision because of its "wilful and wanton acts of fraud, conspiracy and conversion."  (Pl.'s Resp. to Maersk's Mot. 12.)  As evidence of Maersk's wilful and wanton conduct, Beirut points to two sections of the Salavagesale contract that speak to Maersk's obligation to have the authority to sell the goods that it places up for auction.  Section 4 states in pertinent part that: "Seller must have the authority to sell any items it lists for sale on the Site, free and clear of any liens, claims or other encumbrances. Seller agrees to use commercially reasonable efforts to supply accurate information for each listing, and will be solely responsible for the listing information seller provides."   Beirut also points to the Salvagesale Listing Policy which provides in relevant part: "Some manufacturers of branded goods protect their brands by contractually restricting the wholesale or retailers of their goods from re-selling the goods through certain channels."  (Pl.'s Resp. to Maersk's Mot. Ex. B p. 3.)

Maersk responds that it used commercially reasonable efforts in listing the Bags because it relied on the express notice of abandonment from its consignee.  (Maersk's Mot. 2-3 Ex. D.)  Even

though Maersk had the right under its shipping contract with Ampac to consider the goods abandoned long before it chose to do so, Maersk waited until it received the formal letter of abandonment from Hecny before deciding to list the cargo on Salvagesale. (Maersk's Mot. 2-3 Ex. A ¶ 22.3, Ex. D.)  Beirut offers no evidence that Maersk was aware of Neiman's potential trademark claims against sale of the Bags and indeed accepts as true that Maersk had no actual knowledge of Neiman's claims.  (Pl.'s Resp. to Maersk's Mot. 15.)  Beirut offers no authority for its position that Maersk had an obligation to go beyond the formal release from its consignee (Hecny/Ampac) to ascertain the existence of any outstanding claims against the cargo.  Faced with Maersk's motion for summary judgment, Beirut was obligated to come forward with evidence demonstrating that it was not commercially reasonable for Maersk to rely on the abandonment notice of its consignee. It has failed to do so.

### b.  The Doctrine of Impossibility of Performance

In *Liggett Rest. Group, Inc. v. City of Pontiac*, 260 Mich. App. 127 (2004) the court discussed the doctrine of frustration of purpose, holding that the following conditions must be present:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event now reasonably foreseeable at the time the contract was made, the occurrence of which
>
> has not been due to the fault of the frustrated party and the risk of which was not assumed by him.

260 Mich. App. at 134-35.  In setting forth the elements of the defense, the court referenced the Restatement of Contracts, § 265, which provides as follows: "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event

the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."   The comment to § 265 further clarifies: ". . . [T]he non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. This involves essentially the same sorts of determinations that are involved under the general rule on impracticability. *See* Comments b and c to § 261. The foreseeability of the event is here, as it is there, a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption."   Section 261, covering the related defense of supervening impracticability, provides: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."   *See Roberts v. Farmers Ins. Exch.*, 275 Mich. App. 58, 74 (2007) (recognizing the doctrine of supervening impossibility which develops after the contract in question is formed).   "Where there is conflicting evidence on the question of impossibility, it is a question of fact for the trier of fact to resolve."   *Id*.

Maersk argues that in this case "neither party anticipated Neiman Marcus swooping in to squelch the deal."   Further, the defense of impossibility applies in full, since performance of the contract was completely barred.  Both parties would have faced legal action by Neiman as expressly evidenced in correspondence from Co-Defendant's attorney if the sale had not been terminated." (Maersk's Mot. 14.)  Beirut responds that a suit by Neiman was not a legal certainty, particularly in view of the fact that the judge in the Texas lawsuit between Ampac and Neiman refused to issue a preliminary injunction prohibiting Maersk from selling the Bags to Beirut.  (Pl.'s Resp. to

27

Maersk's Mot. 16-17.)  That suit was settled out of court.

Beirut further argues that Maersk was entitled, under the terms of its shipping contract with Ampac/Hecny, to seek indemnification from Ampac (although again Beirut confuses Neiman and Ampac and implies that Neiman, who was not a party to the shipping contract, would be liable for the indemnification) in the event that it did face litigation from Neiman over the Bags.  (*Id*. 17-18.) Oddly enough, contrary to its argument that Maersk breached the Salvagesale agreement by failing to ascertain its right to sell the goods, Beirut argues here that Maersk had "a valid lien on the abandoned goods" and therefore the contract was not frustrated by the Neiman threats of litigation. (*Id*. at 18.)  In short, Beirut argues that Maersk should have ignored the Neiman threats, delivered the goods to Beirut and subjected itself to a lawsuit for trademark infringement.  Ironically, if Maersk had proceeded with sale and allowed Beirut to pick up the Bags, no doubt Neiman would have sued Beirut to prevent it from attempting to sell the Bags.  No doubt Beirut would have turned around and sued Maersk for completing the sale. This "catch-22" points out the infirmity of Beirut's argument that Maersk was not prevented from performing the contract because of the Neiman threats of trademark infringement claims.  While it is true that the question of impossibility is a question for the trier of fact where the there is conflicting evidence on impossibility, the evidence proffered by Beirut does not create a genuine issue of fact on this issue.  In fact, the subsequent series of events, which are not part of the allegations in Beirut's complaint, demonstrate that the Bags have been destroyed as a result of the Ampac/Neiman settlement agreement, thus making impossibility a foregone conclusion.

### 2.  Statutory Conversion and Civil Conspiracy - Neiman and Maersk (Count III)

The elements of a claim of statutory conversion are outlined above at pages 17-19.  For the

28

same reasons that Beirut can not sustain a claim of statutory conversion against Neiman, it can not sustain such a claim against Maersk.  If anything, Maersk would be the party actually alleged to have converted the Bags and such a claim is not actionable under MCL § 600.2919a.  *See supra* discussion at pages 17-19.  Similarly, the claim of civil conspiracy, which requires as an essential element "a concerted action," fails to create a genuine issue of material fact as to Maersk. There simply is no proof that Neiman and Maersk were acting in concert, according to a pre-conceived plan.  The facts presented by all parties support the conclusion that Maersk was reacting to Neiman's threats, not acting in concert with Neiman against Beirut.  *See supra* discussion at pp. 17-20.

### 3.  Fraud - Maersk (Count V)

The elements of a claim for fraud are set forth above at pages 20-21.  Critical to sustaining a claim of fraud is an allegation of a knowing or reckless false representation of fact.  Beirut claims that Maersk "fraudulently listed the Bags for sale on Salvagesale.com when it was apparently unsure if it had the authority to sell them."  (Pl.'s Resp. to Maersk's Mot. 20-22.)  Neither this allegation, nor any against Maersk on the claim of fraud, assert that Maersk knew that the listing was false. Beirut states that at a minimum, it was reckless of Maersk to list the Bags.  However, it is clear from the evidence submitted by both parties, including the Hecny letter of abandonment, that Maersk was not "reckless" in listing the Bags for sale.  Nothing proffered by Beirut creates a genuine issue of fact as to the intentional or reckless nature of Maersk's listing of the Bags on Salvagesale.com. Beirut also implies that Maersk falsely stated its reason for canceling the contract, i.e. that Neiman had asserted its trademark rights with respect to the Bags, and that Maersk had some ulterior motive for cancelling the contract.  (Pl.'s Resp. to Maersk's Mot. 22-23.)  Beirut offers absolutely nothing but its own self-serving statement of falsity to support this contention.  Indeed, all evidence is to the

contrary, i.e. that Maersk was responding to Neiman's assertion of trademark rights to the Bags. *See supra* discussion at pp. 20-22.

**IV.   CONCLUSION**

For the foregoing reasons, this Court (1) GRANTS Defendant Neiman Marcus Group, Inc.'s Motion to Dismiss; and (2) GRANTS Defendant Maersk, Inc.'s Motion for Summary Judgment.

IT IS SO ORDERED.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 22, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on October 22, 2009.

S/Denise Goodine
Case Manager